## Russell et al. v. Hogan et al.

May 3, 1940.

Doyle Willis, Judge.

Trimble & Trimble and Phillip J. Kennedy for appellants.

J. D. Standard for appellees.

OPINION OF THE COURT BY MORRIS, COMMISSIONER—Affirming in part and reversing in part.

The appeal before us relates mainly to the distribution of the estate of Mrs. Mary Woodard, who died testate in April 1934. The questions arose on the court's overruling exceptions to the report of the commissioner.

Testatrix had executed two wills both of the same date, May 20, 1925. By both wills, after providing for payment of debts and funeral expenses, she willed to her two sisters Maggie Russell and Nannie Grumbley, her property of every kind "to do with as they please, jointly and for their comfort and support during their life." The will further provided:

> "After the death of one of these sisters the surviving one is to have and to hold. This does not mean that they can give any part of any kind of my estate to any of the heirs. After the death of one of these sisters the surviving one is to have and to hold in the same way as long as she lives. * * * I especially authorize these sisters, if they so desire, to sell any part of the real estate or any personal property and make title as good as if I had signed same. I authorize them to use any part or all of the purchase price if they want it for their comfort and support. They are to be the judges as to whether they need it or not."

The wills are practically the same except in one provision, which was that if Annie Hogan continued to live with her sisters, she was to be accorded free board. It was also provided that in case the two sisters had consumed all the rest of the estate, if needing the proceeds from a sale of the home place they might do so, the balance if any, to be distributed as provided. In this, as in the first will, she requested the court to require no

surety "at any time for anything," **and named her** nephew Russell Hogan as administrator.

Russell Hogan qualified as executor; in his petition filed May 7, 1935, it is shown that the sister Maggie Russell had predeceased the testatrix, and that the other sister had died prior to the filing of suit, but eleven months after the death of testatrix; neither was married at the time of their respective deaths. The three brothers and one sister named in the will had also predeceased testatrix, leaving children who, with their spouses were made parties defendant to the suit. They were residuary legatees.

The appraisement on file showed that testatrix left an estate estimated at more than $25,000, of which sum $10,000 was composed of personal property. The petition, in the form of a declaratory judgment, sought advice of the court as to proper construction of the wills, the powers of the devisees and executor, and other matters which we deem not necessary to set out specifically. Reference will be made to such when we reach the controversial questions presented. It appears that many of the parties entitled to participate in the distribution of the property of testatrix were non-residents, apparently properly before the court on constructive process. The warning order attorney made report, but answer was filed and made a counterclaim as against the plaintiff, Russell Hogan, individually, and as executor of the estate. It was charged that there came into the hands of the plaintiff the sum of $20,000, for which he failed to account.

The executor, replying individually and officially, some of the heirs at law joining, denied the affirmative allegations of the answer, and reiterated that the estate coming to his hands was correctly set out in his petition. The exceptions to the report involve the following matters and items, in so far as they are discussed in the briefs of the respective parties. The court overruled all exceptions.

(1) Payment of a note of testatrix held by Mrs. Grumbley, $258.20, on the grounds that the note was never presented to the executor, and that same was not proven.

(2) Payment of a check of testatrix to the order of

Mrs. Grumbley for $100, which was never presented to testatrix (or bank) during her lifetime, and was barred.

(3) Payment to Mrs. Grumbley for living expenses, $450.

(4) Payment of funeral expenses of Mrs. Grumbley, $450.

(5) Payment to Annie Hogan, sister of executor, for repairs on house, $221.28.

(6) Payment to executor as commissions, including mileage, $1,089.48.

In a general exception to the commissioner's report as to receipts shown as exhibited by executor, it was charged that there was no accounting for:

(a) Jewelry owned by testatrix during her lifetime, consisting of six diamond rings and a watch; a small bar pin, and two imitation rings.

(b) The executor purchased furniture at his own sale; gave a portion of it to his sister and accounted for this by substituting furniture of Mrs. Nannie Grumbley.

(c) Executor failed to account for $20,000 in gold, silver and currency found by the executor in a trunk, and claimed by appellants to be the property of testatrix.

It may be observed that the determination of the questions which are discussed in briefs will turn chiefly upon the testimony and exhibits filed in the record. The transcript is voluminous, 500 or more pages being covered by exhibits. We have had some difficulty in working out these matters, due to the fact that in some instances briefs do not refer us to particular bits of evidence.

One objection is to a payment of $281 to Annie Hogan for repairs on a house. This transaction arose in this way: The cottage was one owned by testatrix; under her will it became the property of certain named residuary legatees, some of whom are appellants. Annie Hogan was one, as was also appellee. The property had been in the hands of a tenant, and as shown in proof was in bad repair. Mrs. Grumbley had suggested its sale, and it may be gathered that Miss Hogan was a

prospective, and later became actual purchaser. It appears that Miss Hogan had moved into the house, and the executor says he had the work done, or made arrangements for it to be done, and had told her that he would pay for the improvements when completed. He did not come to Elkton for some time, but later found that she had paid the account. He got an itemized statement, and refunded what she had paid. Several weeks after the repairs were made Miss Hogan bought the house, paying $1,500 for it, though its value was estimated at about $1,300. It seems that a relative had "run the price up on her," according to his idea, making her pay $500 more than it was worth.

Argument of counsel is that there was no authority given by the will for the executor to make repairs on real property, and that the item is "particularly improper" when it is shown that the payment was made to the person "who shortly after repairs were made, became the purchaser." It is true that a personal representative, without express authority, has no control over the real estate. Here however, it is shown that both the executor and the purchaser were joint owners, along with other legatees in possession, and being so one or more had the right to make necessary repairs, and have contributions from joint tenants.

"The rule is that where the joint property is falling into decay, and one such tenant of his own means makes reparations to protect the common property or to make it habitable, he should be compensated therefor, with a lien to secure him." Mastin v.

Mastin's Adm'r, 243 Ky. 830, 50 S. W. (2d) 77, 79, and cases cited.

There was no contention, nor is there any now, that the improvements were not made, or that the cost was excessive. Further, as we read the proof, there was an enhancement of the vendible value, as was reflected in sale, and the complaining joint owners reaped the benefit.

The next item is that of funeral expenses of Mrs. Grumbley paid by the executor, to the amount of $450. Counsel for appellant does not discuss this item to any extent, though mentioned in the exceptions. As we read one of the wills of testatrix, we find that it provided:

"* * * division is not to be made until after the death of these sisters, and their debts (if any) paid and all funeral expenses paid. I should like plain markers placed at our graves."

From this language it is clear that it was the intention of testatrix that her sister's funeral expenses be paid from the estate property before any distribution.

The next item is the payment to Mrs. Grumbley of $450 in smaller sums at various times for her living expenses. The record shows that Mrs. Grumbley died eleven months following the death of testatrix. The argument by appellants is to the effect that the testimony shows that the manner of living employed by Mrs. Grumbley after the sister's death "was in all respects the manner of living employed before her sister's death," and does not point out what was the manner in either instance. We gather from the proof, that in both instances she was frugal, and certainly miserly; since it is in proof that testatrix, prior to her death, had paid some part of her sister's living expenses. The fact that at some remote date she and her husband obtained board for both at $20 a month would not lead to the conclusion that she was required to limit herself to expenditures of $10 per month. The testatrix by her will evidently did not so intend. The exception was to the payment of $450. The argument is that it was too much, which means that it should have been scaled down, though appellants suggest that nothing should have been paid.

It is noted from the proof that Annie Hogan, as per the terms of the will, lived with the sister without payment of board, and no doubt a portion, at least of the payment went to her support. The payment of the meager amount by the executor was proper.

The next complaint is that in allowing the executor his commission, $1,089.48, there was included an allowance for expense of travel, and that the 5 per cent commission included an allowance on money which he paid himself as his share of the estate, and was made without court order.

After much search into the voluminous record, we find that in the preliminary settlement the executor charged as a credit, $889.48, apparently commission and

expenses. The only exception to this item is that the executor was not entitled to any commission until the court had fixed the compensation by order. In a supplemental settlement of the commissioner, the executor was allowed an additional commission of $167.19, and a claim for mileage of $50.45, to which sum total appellants excepted.

There is no argument that the total amount paid to the executor is unreasonable, nor was any exception filed based on this ground. Section 3883, Kentucky Statutes, provides:

"That upon proof heard in open court, upon proper notice to the parties in interest, the court may make an allowance when the executor * * * has, in the proper discharge of his duties in attending to administering and settling the estate in his hands, been required to perform extraordinary services; but such allowance shall not exceed in amount a fair compensation for the time occupied, and expenses incurred in protecting, attending to, collecting and settling such estate, and five per cent (5%) on all amounts received and distributed."

It is said in appellee's brief that the procedure was followed to the letter, and that the personal representative testified by deposition, and later orally in open court, but the last named proof does not appear in the record. It is shown in the transcript that the executor had paid some expenses incident to the sale of certain property. There was some litigation; some claims against the estate of Mrs. Woodard. He looked after the properties, and had to travel some distance in so doing. He lived in the country, and the round trip from his home to Elkton was more than 20 miles. The executor said the charges were reasonable. He said: "I have neglected my own business quite a lot, and more than I will get out of it." We are pointed to no proof which would indicate that the charges were illegal payments.

In the absence of contrary proof taken on these questions, in open court, we may assume that the court was justified in overruling the exception. The fact that the representative was allowed commission on the portion coming to him from the estate, would not be a substantial ground for exception. Hamilton v. Nunn, 247 Ky. 715, 57 S. W. (2d) 655.

It is charged by appellants that the executor failed to account for certain jewelry owned by testatrix during her lifetime, and described in item "a" supra. It will be noted that there was not even a general charge that this jewelry came to the hands of the executor. In fact as we search the record we do not find an exception based on the ground that the executor had received and failed to account for any one of the named items. The general rule is that exceptions to be effective must be definite as to each item of the report referred to and must not challenge the report as being erroneous, in a general way, "but must point out specifically the error upon which the excepting party relies. Inaccurate or general exceptions will not be considered." 21 C. J. p. 620.

The proof shows that Mrs. Woodard owned at the time of her death two genuine diamond rings. She also had two imitation diamond rings which she at times wore. These were produced by the executor. The estimated value of rings was about $135.

There was testimony that Mrs. Woodard during her life had directed that one of her nieces should have any of her jewelry which she desired, because "she has been so good to me, I want her to have any keep sake that she wants." After the death of testatrix the jewelry or rings were kept by Mrs. Grumbley, and were turned over to the niece. On this point we are not called upon to decide whether there was either a gift inter vivos, or that they were turned over to or held by the sister in trust, but we do hold that the exceptions on this point were defective to such an extent as not to put the executor to proof.

The next charge is that the executor purchased furniture at his own sale; gave a portion of it to his sister and later accounted for it by substituting furniture of Mrs. Grumbley. We are at a loss to know just what was intended by this exception. Whatever it be, we find that there was no specification in the exceptions, and what is said above as to the jewelry is applicable here.

Counsel in brief says that the "intrinsic value of this property is probably so small, as to be a case of de minimis," but raises the question as indicative of the misconduct of the executor in dealing with "the trust

estate as though it was his own." And as we read the meager proof with relation to these items, we are convinced that the court, if the matter were properly before him, was satisfied with the explanation given by the executor of these alleged minor infractions.

We come now to the last and most important exception, which was raised also by pleading. It appears that shortly after the death of Mrs. Grumbley there was found in gold and gold certificates, a sum of $19,795, hidden in a trunk belonging to Mrs. Grumbley and about $100 tied up in rags and in an old bucket covered with feathers, and some in the wardrobe; these latter receptacles being in the room occupied by Mrs. Grumbley. The old zinc covered trunk was found in a storeroom adjoining the bedroom of Mrs. Grumbley. The key to the trunk according to some witnesses, was found in Mrs. Grumbley's wardrobe where she had told witness it was kept; she also said she had money in the trunk.

The record shows as contended by appellant, that testatrix was recognized as a shrewd, calculating and active business woman. For more than fifty years she carried on a millinery business in Elkton. In addition it was generally known in the community that she loaned considerable sums of money, in the main well secured, and at the "top" rate of interest. Her investments were generally regarded as good. She was frugal and there is little, if any proof of extravagant expenditures, or losses from investments, save in real estate.

Some time in 1924 she gave up the millinery business, and maintained an office in one of her buildings where she looked after her properties and continued to lend money. It is argued that Mrs. Grumbley had no particular business or occupation. She did assist testatrix in her millinery business, particularly during busy periods. In appraisement of her property it was shown that the total was something over $26,000, but this included the cash which was found by the administrator. She had two certificates of deposit of about $5,900; the remainder was made up of nonvaluable household articles. Upon the death of her husband, about 1922, she received from his estate approximately $7,500.

She had another source of income, which was by way of periodical contributions in cash to the sisters

and Miss Hogan. These contributions came directly to testatrix, and she divided with the others. This lasted over a period of four to six years and it is estimated that Mrs. Grumbley may have received from this source around $6,500.

While it is shown that testatrix was a lender, she nevertheless at various times, borrowed from Mrs. Grumbley. The amounts were small, ranging from $200 to $1,100, and covering intermittent periods from 1904 to 1927. It is not inconsistent to assume that these notes were given at times when testatrix did not have ready funds, though one would indicate a joint purchase of some bonds by Mrs. Grumbley and testatrix. There is some testimony that a purchaser of a farm borrowed from Mrs. Grumbley (1922) about $3,300, though this transaction is not made clear, since there is no showing of the note or of any mortgage.

The foregoing is the general background of the situation of the two sisters. There was some testimony which it is argued threw some light on this situation. A close friend of all the parties interested was a frequent visitor in the home, and had worked for testatrix. She testified that as far as she knew, testatrix never kept any money around her home, however she said that all she knew of her financial affairs was what she was told by testatrix. This witness testified that testatrix sometimes borrowed for tax payments, "because she had her ready cash at loan."

Just before her death testatrix invited a nephew to visit her; she was interested in him because he was blind. It is said that while on this visit, and in the presence of Daisy Crawley and one Midderman, testatrix told her nephew he need not worry, because in addition to her real property holdings, she had some $30,000 in cash, and that he would be adequately cared for after her death. Miss Crawley fails to verify this, and Midderman said that on the occasion mentioned, his recollection was that Mrs. Grumbley said, "she didn't know what would happen to her if aunt Mary died first." Mr. Russell (the nephew) said, "aunt Mary will take care of you, and she (Mrs. Grumbley) said she had only a few thousand dollars, and she didn't know how long that would last." As to the other conversation, witness' recollection was, "they didn't have to worry;" that she

(testatrix) had a considerable amount of money, and that would take care of them if anything happened.

Proof and argument thereon, pointed out by appellees is that only a number of the residuary legatees who had better opportunity to know the facts are not contending that the hidden money was the property of Mrs. Woodard. The money found was in a trunk, in a place above described, not visited frequently by testatrix. Mrs. Grumbley occupied the same room long before and for nearly a year after her sister's death. The key to the trunk was in her possession, and there is no showing of transfer of possession of this hidden fund from Mrs. Woodard, if at any time such was made. There is no sort of showing that the character or reputation of the executor or Mrs. Grumbley was such as would lead one to believe that either would stoop to defraud. There is innuendo and surmise, without proof. There is argument that the estate of testatrix should have been greater at the time of her death, and Mrs. Grumbley's much less, than each developed.

The proof shows that Mrs. Woodard never kept any amount of money about the home; she kept it pretty closely invested; that she did not have more estate at her death may have been due to the fact that she in part, supported the sisters, and for some time the niece.

The record exhibits, and proof give ample evidence to the fact that she carried on most of her transactions by checks. Her appraisement showed more than $5,000 deposits and certificates of deposit. One volume of the transcript contains 150 pages of exhibits, showing her bank transactions from 1919 to the date of her death, many of the checks for small amounts.

Her banker with whom she discussed business matters, said that she never mentioned the fact of having money concealed about the house, but did complain that Mrs. Grumbley kept gold and silver; she had heard voices around the house, as if some one were trying to get in, and advised her sister to deposit the money in the bank, but that she was "afraid to do so." Testatrix sometimes took more money from the bank than she needed for some special purpose, and would return the part not needed. The witness said that Mrs. Grumbley had done little or no banking business since 1921, the

year of her husband's death. The only deposit she had made in several years was some interest on Government bonds.

When Mrs. Hays, the niece would send her check for her relatives, Mrs. Woodard invariably deposited her portion, but Mrs. Grumbley always took the cash, and sometimes in gold. It was shown that Mrs. Grumbley dressed poorly, and was to an extent of a miserly disposition, though at all times she had some money on hand. Mrs. Woodard was shown to have suffered some losses, particularly in real estate transactions. Mrs. Grumbley did not invest, hence did not have opportunity to lose. Mrs. Woodard's losses, covering a period of years, was estimated at about $20,000.

Mrs. Grumbley, as early as 1899, showed one witness currency which she had in her trunk. In 1893, before her husband's death, she paid $500 in cash for a small parcel of real estate. It is shown that from 1919 up to as late as 1927, there had come into her hands, from various sources, more than $19,000, including what she had received from the niece, and the $7,500 from the estate of her husband.

It was also shown that she had saved some of her earnings while at work in the millinery store. It is noted in one receipt, May 1917, in which Mrs. Grumbley receipted to testatrix for $1,567.68, in payment of two notes she recited: "This was all paid in full to me in gold." This would indicate that testatrix was not hoarding gold.

We consider together the first and second items as set out above. Appellants excepted to the payment of the note of $258.20, executed by Mrs. Woodard on September 21, 1927, and presented to the executor after Mrs. Woodard's death. The only contention is that the note was paid "without proof of any kind and without consultation by the executor as to the advisability of payment without proof." The check for $100 was more than ten years old, and like the note was paid without proof. There is no argument that the note was at the time of presentation barred by limitation, but it is argued that the collection of the check was barred, and in this they are correct. Section 2515, Kentucky Statutes.

There was no sort of showing that the executor had,

or might have had any defense to the note, but the check showed on its face that it was a stale claim, and barred by the provisions of the statute. In fact the executor said he knew that the check was barred, but nevertheless without further inquiry paid it.

Those excepting to the allowance of the payment of the note made no sort of pretense that it was subject to any defense; no claim that it had been paid, or that it was given without consideration. Under these circumstances the executor if he believed the note a valid one, and due and unpaid, could upon demand pay the note without subjecting himself to liability. However, this would not be true as to the check, since the executor said that he knew it was barred by limitation, and gives as his only reason for paying same that the holder said she was treating it as a note, and the executor knew it was not a note, but merely an order for the bank to pay the holder the face of the check.

It is the general rule that it is the duty of the representative to assert the bar of limitations, particularly so when the claim was barred at the time of decedent's death, or that it is so stale as to raise presumption of payment, though we have held that it is sometimes left to the discretion, and he may waive the plea of bar where he believes the claim to be just, due and unpaid. 24 C. J. 297, citing Kentucky cases under note 20.

However, we find no case, nor are we furnished with any authority which would justify us in holding that as here, where the personal representative says he knew the payment of this check was barred, and does not say that he knew or made inquiry of its justness, should not have required verification. We are of the opinion he paid this at his individual risk, and should account for the amount. McBride v. McBride, 262 Ky. 452, 90 S. W. (2d) 736.

As noted above, the chancellor overruled all exceptions filed by appellants. It is manifest that the chief contest was in respect of the hidden money. On this phase the chancellor heard much proof. There is no doubt in our minds that his conclusion on this (and others mentioned) was correct. Our fixed rule is that if there be no more than a doubt, we are to follow the rulings of the chancellor. Talbert v. City of Winches-

ter, 277 Ky. 164, 125 S. W. (2d) 1002; Lashley v. Lashley, 276 Ky. 689, 125 S. W. (2d) 247.

Our conclusion upon the item of allowance to the personal representative obviates the necessity of passing on appellee's motion to dismiss, which was passed to the merits.

It follows that we must affirm the judgment in all respects, save as to the allowance of the $100 of the unverified barred check, and are put to the necessity of reversing on that ground alone, with directions to enter judgment against the personal representative for that amount. The clerk of this court will tax costs against appellees for one-twentieth of cost bill, the balance against appellants. This being based approximately on the proportion of the claims to which parties excepted, and which exceptions we rejected, and the one which is upheld.

Affirmed in part and reversed in part.