## Hudson et al. v. Howell et al.

Nov. 25, 1941.

B. T. Rountree and G. D. Milliken, Sr., for appellants.

Joe S. Garman and Charles R. Bell for appellees.

Opinion of the Court by Judge Cammack—Affirming.

In August, 1939, the appellants, H. S. Hudson and his wife, Clarice, listed their farm of 186 acres in Warren County for sale, exclusively, with Luther Long, one of the appellees, under a written contract wherein the minimum price was fixed at $75 an acre, unless another farm could be purchased for a stipulated price. About the middle of November, the Hudsons entered into a written contract with Long and C. M. Carter, another appellee, calling for the sale of the farm and certain personalty at public auction on November 29th. The auction contract contained a provision that the parties agreed and expressly understood that the land was to sell at the highest bid when put up at auction. The farm was knocked off to Albert Howell, the third appellee, at $47.25 an acre. He and the auctioneers signed the sale contract, but the Hudsons refused to do so.

Howell brought this action against the Hudsons and the auctioneers seeking specific performance of his contract. Long and Carter filed a cross-petition against the Hudsons, seeking to recover their commissions on the sale. The Hudsons filed joint and separate answers to the petition and cross-petition. The issues were joined and considerable proof was taken by both sides. The trial resulted in a judgment directing specific performance of the sale contract and adjudging that Long and Carter recover on their cross-petition for the commissions claimed by them. The Hudsons are appealing.

They insist that (1) the auction sale contract entered into by them and Long and Carter was obtained by "fraud, unfairness, sharp practice and inequitable conduct"; (2) Long and Carter indulged in such breaches of the contract, fraud, sharp practice and inequitable conduct as to cause confused and stifled bidding, whereby the farm was sold to Howell as a preferred bidder; (3) Clarice Hudson was a joint owner of the farm but was never consulted by the auctioneers about the terms and conditions of the sale, and therefore it is not binding upon her, and, since the contract is not divisible, it is not binding upon her husband; (4) H. S. Hudson revoked and rescinded the auction sale contract by withdrawing the farm from the market; (5) Long and Carter were the agents of Howell, as well as the Hudsons, and therefore Howell can not reap the benefits of fraud, sharp practice and inequitable conduct of the auctioneers; and (6) the right of specific performance is not an absolute right to be arbitrarily enforced at the will of the plaintiff.

The appellants place emphasis on the contract under which they listed the farm for sale with Long in August, at a minimum price of $75 per acre. It is their position also that Long induced them to enter into the auction sale contract by saying that he had buyers who would pay as much as $11,000 for the farm, and others who had stated that they would pay as much as $12,000 for it, and that those prospective buyers would be present at the sale and bid on the farm. Long testified that Hudson came to him after he had arranged to purchase another farm and said that he wanted to sell his property at auction and that he was willing to sell to the highest bidder. We have noted that such a provision was contained in the contract which the Hudsons and the auctioneers signed. Long denied that he told Mr. Hudson that he would have a bidder who would go as high as $12,000 on the farm, and that nothing was said about a bid of $11,000 except an exchange on the Martin Smith farm. Mrs. Hudson said that, while they did not have a contract to buy another farm, they were to buy it, provided theirs sold for a price sufficient to pay for it. We fail to see how the original listing with Long enters into the picture. The new contract (the auction sale contract) was clear and definite in its terms, and it provided that the property be sold to the highest bidder.

A contract can not be reformed or set aside in the absence of a showing of fraud or mistake, or unless it is an illegal contract. Barrett v. Leyman Motor Company, 285 Ky. 110, 147 S. W. (2d) 51. Previous negotiations between contracting parties are presumed to be abandoned or incorporated in the written instrument. We find no showing of fraud or sharp practice on the part of Long and Carter in the obtention of the auction sale contract.

It seems that the parties agreed that the farm would be sold around 1 o'clock and the sale started about that time. The bidding appears to have been rather slow, and, after discussing the matter, Long and Carter decided to go to the barn and sell the livestock before continuing to cry the farm. At that time the high bid was around $40 per acre. Hudson went to the barn with the auctioneers and furnished such information as was requested of him concerning the livestock. As they were returning from the barn somewhere around 3 or 4 o'clock, he said that he told Long that they were not going to let the farm go. Long denied, however, that Hudson made any such statement to him. It is Hudson's position that the auctioneers breached their contract by quitting the sale of the farm and going to sell the livestock. Notwithstanding his statement that he told Long that they were not going to let the farm go, he did nothing to notify those present that he wanted the sale called off. There is also some evidence that the whole sale was conducted in an improper manner, but we think that the proof is overwhelmingly in support of the contentions of the appellees that it was conducted regularly. Hudson's chief objection seems to have been that the personalty and the land did not bring as much as he wanted for them. There is a charge that confusion and misunderstanding resulted as to bidders, the amounts bid and the manner in which the bids were conveyed. There is testimony on the other hand, however, that the sale was conducted as auction sales are generally conducted, and that persons who were keeping up with the bidding knew who the bidders were. As we understand the record, there is no showing that any persons who were interested in bidding on the land left the sale after the auctioneers stopped crying it the first time. There is testimony that the auctioneers were active when the sale of the land was

resumed and the price was raised from around $40 an acre to $47.25 before the farm was knocked off to Howell. This of itself would indicate that it was to the advantage of the Hudsons to postpone the land sale. Certainly the mere fact that the sale was conducted around 3 or 4 o'clock rather than at 1, would not of itself indicate fraud or sharp practice.

The chief controversy seems to hinge around Martin Smith's bid. Smith went up to the Hudsons some 10 minutes after the farm was knocked off to Howell and said that he had bid $47.25 and that immediately thereupon Carter, who was crying the sale, pointed to him and said, ''That's your bid. I will take care of you,'' and then announced the farm was sold to Howell. There is other testimony to this effect. When asked what his bid was previous to the $47.25 bid Smith said that he did not know, and that it was probably 50 cents or a quarter, and also, when asked whether there were any bids between his last and next to last bids he said, ''I'm almost sure I bid $47.00''; but in answer to the question, ''You are pretty certain you bid $47.00?'' he said, ''I think I bid that. I think it was only a quarter raise. I mean the man that bid before I did bid $47.00, and I bid a quarter, $47.25.'' There is proof for the appellees that Smith's bid was $47 and that when he bid $47.25 he was told that that bid was against him: Carter denied making any such statement as ''That's your bid. I will take care of you,'' and there is proof in addition to his own that it was several minutes before the farm was finally knocked off to Howell. Criticism is directed also toward the manner in which Howell conveyed his bid to Carter. He either winked or nodded to Carter when he made a bid. There is testimony, however, from persons who were following the bidding that they knew Howell was bidding and knew the amount of his bid. It seems to us that, if there was any basis for the charge of collusion between Howell and Carter, which, of course, Carter denied, the last thing that he would have done would have been to announce publicly to an opposing bidder, ''That's your bid. I will take care of you.'' We may say in this connection that there is testimony that the farm brought about what it was considered worth, namely, between $40 and $50 an acre. The ruling of the chancellor in decreeing specific performance held, in effect, that the charge of fraud in the manner of con-

ducting the sale was groundless. We are not disposed to disturb that ruling.

It is contended that the sale should be declared void because Mrs. Hudson was not consulted about its terms and conditions. This we consider groundless. She signed the auction sale contract. She was present during the sale, though not present at the time the conditions of the sale were announced, and she knew that her husband was with the auctioneers. We think Hudson was acting for himself, as well as his wife, during the sale.

We have noted Hudson's testimony as to what he said to Long about not letting the farm go, and also Long's testimony to the contrary. Carter testified that he heard no complaint from Hudson during the sale, and the first he knew of any dissatisfaction on Hudson's part was when he was asked to sign the sales contract. We have pointed out also that, notwithstanding what Hudson claims to have said to Long, he stood by and let the auctioneers continue with the land sale and saw it knocked off to Howell without making known to him or anyone else that he did not intend to let the farm go. As heretofore indicated, we find no basis for the charge of fraud, sharp practice or inequitable conduct on the part of the auctioneers. This being the case, it is unnecessary to discuss the question of whether or not they were the agents of the sellers or the buyers, or both parties.

Howell made out a case for specific performance and the chancellor did not abuse his discretion in so directing.

It follows necessarily that the auctioneers were entitled to their commissions.

It is our conclusion on the whole case that the finding of the chancellor should not be disturbed. It is our rule that, where we have no more than a doubt as to the correctness of the chancellor's ruling, we will not disturb it. Lashley v. Lashley, 276 Ky. 689, 125 S. W. (2d) 247; Wilson v. Wilson, 280 Ky. 461, 464, 133 S. W. (2d) 722; Russell v. Hogan, 282 Ky. 764, 140 S. W. (2d) 615.

Judgment affirmed.